UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | | |
|---|---|---|---|
| ASATA D. LOWE, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:08-cv-489 |
| | ) | | (VARLAN/SHIRLEY) |
| JAMES FORTNER, Warden, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## MEMORANDUM

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Asata D. Lowe ("Lowe").  The matter is before the court on the respondent's motion to dismiss and renewed motion to dismiss, Lowe's motions for summary judgment, and numerous non-dispositive motions filed by Lowe.  For the following reasons, Lowe's motions for summary judgment will be **DENIED**, the respondent's motions to dismiss will be **GRANTED**, the petition for the writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.  All other pending motions will be **DENIED** as **MOOT**.

## I.     Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254.  Under Rule 8 of the Rules Governing Section 2254 Cases In The United States

District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that Lowe is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.     Factual Background

The respondent has provided the court with copies of the relevant documents pertaining to Lowe's direct appeal and post-conviction proceedings. [Court File No. 28, Notice of Manual Filing of Documents, Addenda 1-34]. Lowe was convicted in the Circuit Court for Blount County, Tennessee, of two counts of first degree premeditated murder and one count of especially aggravated robbery; he was sentenced to concurrent terms of life imprisonment on the murder convictions and to a consecutive term of imprisonment of 25 years on the robbery conviction. His convictions and sentence were affirmed on direct appeal. *State v. Lowe*, No. E2000-01591-CCA-R3-CD, 2002 WL 31051631 (Tenn. Crim. App. Sept. 16, 2002), *perm. app. denied, id.* (Tenn. Feb. 3, 2003) [Addendum 14[1]].

On direct appeal, Lowe challenged *inter alia* the sufficiency of the evidence against him. In a lengthy summary, the Tennessee Court of Criminal Appeals stated the evidence against Lowe as follows:

---

[1]The opinion of the Tennessee Court of Criminal Appeals on direct appeal was incorrectly referred to by respondent as Addendum 13 in the Notice of Manual Filing of Documents.

A.    State's Proof

Officer Robert Hubbard, a member of the Drug Task Force of the Blount County Sheriff's Department, testified that on October 16, 1998, he was at Shaggy's Market, a convenience store on Aluminum Avenue in Alcoa, Tennessee. According to Hubbard, late that afternoon the door to the store "opened and a young man fell through the door." Hubbard testified that the man was "bleeding from ... his sides." Hubbard immediately dialed 911 and, at the same time, walked over to the victim and "did chest compressions" to keep him breathing. Hubbard testified that the victim was still alive when the ambulance arrived, but he appeared to be dying. Hubbard recognized the victim as Charles "Bill" Hill and stated that the victim "frequented" Shaggy's Market. Hubbard testified that Stacey's Place, also known as Stacy's Bar and Grill, was separated from Shaggy's Market by two dumpsters. Hubbard stated that Stacey's Place was not operated as a full-time business; however, parties were often held there.

Larry Sankey testified that at around 5:15 or 5:30 p.m. on October 16, 1998, he stopped at Shaggy's Market to buy a Coke, and as he started to walk out the door, he heard gunshots. Sankey recalled that approximately ten seconds later, he saw a man running towards him. According to Sankey, just as the man "got to the drive ... it was just like he hit a brick wall ... his hands went up." Sankey could tell that the man had been shot because "the blood just spurted ... out his side."

Sankey testified that the man fell when he reached the side of Sankey's car in the parking lot, and less than a minute later, Sankey heard a car pulling out of the driveway to Stacey's Place. Sankey described the car as an "older, large" Oldsmobile or Pontiac, which was dark red or wine-colored. Sankey testified that he was sitting in his car when the wine-colored car pulled away from Stacey's Place. Sankey stated that his window was down and that the front windows of the wine-colored car were also rolled down. Sankey testified that he was able to see two individuals in the vehicle and he described them both as African American males. Sankey stated that the driver had a dark complexion and that the passenger was "light-skinned." Sankey thought that the driver appeared to be shorter than the passenger. Sankey was unable to positively identify the Defendant in court as one of the men in the car.

According to Sankey, the car traveled down Aluminum Avenue, "[g]ot to the stop, took a left, went up to Hall Road and took a right." Sankey testified that the route that the vehicle took leads to Alcoa Highway. Sankey stated that

he "went up the street[,] ... looked both ways, turned, came back[,] ... went to where the victim was ... and waited on the police officers." Sankey testified that he did not see anyone else at Stacey's Place. When police officers arrived, Sankey gave them a description of the vehicle and the route that it had taken. Sankey stated that the car was moving "fast" when it pulled out of Stacey's Place.

Kevin Condee, a deputy sheriff with the Blount County Sheriff's Department, testified that on October 16, 1998, he was working as a patrol officer when he responded to a report that a major crime had occurred on Aluminum Avenue. Condee first went to Shaggy's Market, where he "saw a black male subject slumped over in the doorway of the business, with some other people around him." Condee testified that the man was "bleeding severely from the front part of his body. There was just a lot of blood." Condee stated that the man appeared to be "struggling ... to breathe," but Condee could not tell if the man was conscious. Condee recognized the man as Charles "Bill" Hill.

Condee then spoke with Larry Sankey, who gave him information regarding a car containing passengers which had left the area of the crime. Condee immediately transmitted this information on the radio to other officers. Condee described the car as a "maroon or wine-colored Buick, four-door-type car," and he announced that the car was traveling on Hall Road towards the bypass area.

Condee testified that there was blood outside Shaggy's Market and that there was a "blood trail" between Shaggy's Market and Stacey's Place. Condee testified that a red car was parked in the garage behind Stacey's Place. Condee recalled that a telephone was laying on the ground near Stacey's Place.

Rodney Lovin, a deputy sheriff with the Blount County Sheriff's Department, testified that on October 16, 1998, he was employed as a patrolman with the Alcoa Police Department. Lovin testified that at approximately 5:45 p.m., he received a dispatch reporting a major crime on Aluminum Avenue in Alcoa. When Lovin arrived at the scene, Officer Condee was already there. At the scene, Lovin observed "a black male bent over in the doorway of Shaggy's Market. He was bent over on his knees. He was bleeding very badly from the front side of his body...." Lovin tried to speak to the victim; however, the victim did not respond. Lovin identified the victim as Charles Hill.

Lovin then located a trail of blood which led to Stacey's Place. The trail "went up to the left side of the parking lot, all the way back to underneath a carport area where a back door is." Lovin followed the blood trail and found in the carport a red vehicle with the motor still running. Lovin testified that he was also made aware of a telephone laying near the crime scene. Once Lovin entered Stacey's Place, he observed a male lying on his left side behind the bar with his hand underneath him and "what appeared to be an automatic weapon just a few inches from his body." Unsure if the person was alive, the officers told the person not to move. Upon further investigation, Lovin noticed what appeared to be a bullet wound near the person's jaw. After another officer moved the gun away from the person, Lovin lifted the person's arm and was not able to feel a pulse. Officers then radioed for another ambulance. The second victim was later identified as Sammy Garner.

Deputy Sheriff James L. Wilson of the Blount County Sheriff's Department testified that on October 16, 1998, he was a senior police officer with the Maryville Police Department and that he received a dispatch about a shooting on Aluminum Avenue. He and two other officers went to the crime scene to assist the Alcoa Police Department. Wilson first went to Shaggy's Market, where he recognized Charles Hill in the doorway. Wilson testified that Hill was in distress; according to Wilson, Hill was on his knees "bleeding profusely." Wilson heard Hill "gurgling, attempting to breathe." Wilson stated that Hill appeared to have gunshot wounds to the front portion of his body.

Wilson then followed a trail of blood to Stacey's Place. Wilson testified that he and Sergeant Brooks went inside Stacey's Place. Wilson observed a bullet hole in the glass portion of the doorway leading to the carport. Wilson testified that Brooks noticed a person and a gun. Unsure if the person was alive, Brooks called for assistance. The weapon was removed and secured. Wilson then testified that one officer checked the victim and found no signs of life. Wilson testified that the gun laying next to the victim was a semi-automatic Glock pistol. Wilson also testified that a bullet was laying next to the gun. Wilson later saw a telephone laying on the ground. Wilson testified that the phone was "directly out from the entrance of Stacey's, l[a]ying in the middle of the road."

Sergeant Steve Brooks of the Alcoa Police Department was also called to the crime scene on Aluminum Avenue. Brooks testified that he entered Stacey's Place through the carport. Brooks recalled that the room he entered was very dark. Brooks looked behind the bar, saw a pair of feet wearing work boots, and warned the other officers. Brooks testified that he then got on top

of the bar because he was not sure if the victim was dead. Brooks recognized the victim as Sammy Garner. Brooks then checked the victim for signs of life and called an ambulance. Brooks also observed a gun that was in a "locked and loaded position" and a bullet beside the victim.

Captain Lowell H. Ridings, Jr., testified that he is in charge of the Criminal Investigations Division of the Alcoa Police Department. On the day of the offense, Ridings went to Stacey's Place to perform a "sweep" and to search for evidence of a crime. Ridings stated that the scene "[k]ind of looked like chaos," and he surmised that there had been a shooting. According to Ridings, Garner's body was behind the counter. Near Garner's body, Ridings found a .40-caliber Glock pistol containing a magazine and "nothing in the breech." Ridings also observed a .40-caliber unfired shell laying against the edge of the counter. Ridings examined the gun and determined that it had not been recently fired.

Ridings also found five ejected, fired .45-caliber shells. Three of the shells were located near the door, one was near the corner of the bar, and one was behind the bar. Ridings stated that there were indications that a bullet had penetrated the door; however, officers were unable to find a bullet at that location. Ridings observed on the counter "about a double bread pan full of aluminum foil ... which contained a white powder substance." Near the powdery substance, Ridings found a set of digital scales which he stated are used to weigh small objects in grams.

Derrick Swenson, a patrol officer with the Alcoa Police Department, testified that on October 16, 1998, he was called upon to assist Captain Ridings in investigating the crime scene at Stacey's Place. Swenson testified that "on the counter top" inside the bar he observed one open container of cocaine in aluminum foil. Also on the bar was a zip-lock bag containing a powdery substance. Inside a vending machine, officers found "several baggies of what appeared to be ... a large quantity of crack cocaine." Nine "baggies" of powder cocaine were found in the bottom of the vending machine.

Ernest Kemper, III, a patrol officer with the Alcoa Police Department, testified that on October 16, 1998, he was working as a uniformed police presence at the Clayton Homes Show located on Alcoa Highway. Kemper was in a marked police vehicle. According to Kemper, around 5:30 or 5:45 p.m., he received an emergency dispatch that there had been a shooting on Aluminum Avenue. The dispatch informed officers that the suspect vehicle was a maroon car occupied by two black males. Kemper testified that within

a minute of the dispatch, he observed a vehicle matching that description pass by him on Alcoa Highway. Kemper stated that the driver of the vehicle had darker skin than the passenger. Kemper got into his patrol car, pulled behind the vehicle, and called in the license plate to the police department. Kemper was informed that the tag on the car was not on file. Kemper testified that he then activated his lights and siren and tried to initiate a traffic stop. However, the maroon car continued to accelerate. Kemper testified that the suspect vehicle was traveling at a rate of speed that was at least seventy miles per hour.

Kemper recalled that as his car and the vehicle driven by the suspects neared the Blount and Knox County line, he was not able to receive radio transmissions. The suspect vehicle turned onto Woodson Drive in Knox County. Kemper testified that the vehicle slowed, and the driver's door opened. Kemper drove alongside the vehicle so that the suspects could not flee. Kemper testified that when the cars were right beside each other, the passenger appeared to have a firearm pointed at Kemper. At this point, the suspect vehicle had almost stopped, and Kemper stated that in order to prevent the passenger from shooting, Kemper fired at least one round from his service pistol.

Kemper testified that he then tried to force the suspect vehicle off the road by hitting the rear of the suspect vehicle. The suspect vehicle went through an intersection and was struck by a southbound station wagon. Kemper testified that he believed that his car hit the suspect vehicle again after the first collision. Kemper recalled that the driver exited the vehicle through the rear passenger door and "made a movement with his hands into his waistline." Kemper testified that he told the driver to put his hands in the air, but the driver did not comply. Kemper stated that the driver then made a "sudden movement from his waist towards [Kemper]," so Kemper shot at the driver. The driver fell to the ground. Kemper testified that the passenger tried to get out of the car, but Kemper sprayed him with a chemical spray in order to subdue him. Kemper did not see any weapons on either suspect. More officers soon arrived, and the suspects were transported to a hospital.

At trial, Kemper identified the Defendant as the driver of the suspect vehicle. Kemper testified that he believed that the Defendant was wearing "a pair of camoflauge [sic] britches ... and a red shirt and a bullet proof vest under his red shirt." Kemper identified the passenger of the suspect vehicle as Brian Whitman. Kemper admitted that during the chase, the men could have thrown a weapon from their car without him noticing.

David Gilliam, M.D., the Blount County Medical Examiner, performed autopsies on both victims in this case. Gilliam testified that Garner suffered a gunshot wound to the top of his head and a gunshot near the right corner of his mouth. Gilliam determined that neither of the wounds were "contact wounds."

Gilliam testified that Hill suffered a gunshot to his right back, which penetrated his right lung and hit his heart. Gilliam reported that Hill also suffered a gunshot wound to his left back. Gilliam stated that Hill died of massive blood loss. Gilliam also noted that Hill was probably moving when he was shot.

Greg McCallie testified that on the afternoon of October 16, 1998, he was in Howe Street Park in the Hall-Oalfield community in Alcoa with Charles Hill and Sammy Garner, Jr. McCallie testified that Garner owned an establishment called Stacey's Place and that Garner lived in an apartment above the shop. According to McCallie, Garner kept cocaine in the ceiling of the kitchen and a gun underneath the counter behind the bar. McCallie stated that sometime before sundown on October 16, 1998, Garner asked McCallie to transport him to Garner's bar on Aluminum Avenue because he was having car trouble. McCallie told Garner that he could not go because he had his nephews in the park with him. At that time, Hill offered to take Garner to his bar.

Myron Lea Kellogg testified that on October 16, 1998, Garner also asked him for a ride. Kellogg stated that Garner needed his help to make a drug deal. Kellogg testified that Garner told him that he had cocaine. Kellogg further testified that on or about October 14, 1998, he went with Garner to Atlanta, Georgia, where Garner purchased a kilogram (thirty-six ounces) of cocaine for $27,000. According to Kellogg, when Garner returned to Stacey's Place, he placed the cocaine in the ceiling of the kitchen. Kellogg recalled that Garner kept a .40-caliber gun behind the bar at Stacey's Place. Kellogg testified that he had witnessed "about a thousand" drug deals, and he had never seen anyone wear a flak jacket or a bullet-proof vest to the transactions.

Seneca Toure Teeter was also in Howe Street Park in Alcoa on October 16, 1998. Teeter testified that while in the park, Garner borrowed his cell phone to make a call. Teeter stated that Garner stayed on the phone for approximately ten minutes, but Teeter was not able to hear the conversation. According to Teeter, just before leaving, Garner stated that he was "about to go make a sale and he would be back in a little bit."

Brian Whitman testified that on October 16, 1998, the Defendant asked Whitman to ride with him to Alcoa. Whitman stated that he decided to go with the Defendant because he wanted to see Sammy Garner. According to Whitman, the Defendant was wearing a bullet-proof vest when they left to go to Alcoa. Whitman stated that he had never seen the vest before. Whitman testified that the Defendant was driving Jamal Tory's "burgundy 98" Oldsmobile. Whitman recalled that when they arrived at Garner's club, nobody was there. After a few minutes, a small red car pulled up to the club. Whitman stated that Hill was driving and Garner was in the passenger seat. Whitman testified that he knew Garner but that he did not know Hill.

Whitman testified that both cars parked in the carport. According to Whitman, everyone got out of the cars except Hill, who "came in maybe a minute after [everyone else] came in." Whitman recalled that he talked to Garner and that everyone was friendly. Whitman stated that the Defendant and Garner began to talk, but he recalled that the Defendant and Hill did not even look at each other. Whitman testified that once everyone was inside, he asked to use the phone, and he took the phone outside to make a call. Whitman testified, "By the time I got outside to use the phone, I heard four gunshots." Whitman stated that he "threw [the phone] down and ducked out of the way when [he] saw Mr. Hill run out the door." According to Whitman, Hill ran down the street towards the convenience store. Whitman then saw the Defendant run out of the building with something that looked "[l]ike a little plastic Kroger bag." Whitman testified that the Defendant got into the driver's side of the vehicle and Whitman got in on the passenger's side. Whitman stated that the Defendant threw the bag in Whitman's lap and said that "they tried to kill him."

Whitman testified that the Defendant left Stacey's Place, driving "fast" past Shaggy's Market towards the highway. Whitman stated that he looked in the bag and saw that it was "full of dope." Whitman threw the bag onto the back seat and then he climbed onto the backseat. Whitman testified that he stuffed the bag into the backseat, "[b]ehind the armrest." Whitman climbed back onto the front seat and saw a gun laying beside the Defendant. Whitman then saw a police officer on the side of the road get into his patrol car and warned the Defendant. According to Whitman, the Defendant said that he could not pull over "[b]ecause that's how [he] got caught the last time." Whitman estimated that it took the police officer approximately two minutes to catch up to their vehicle and turn on his lights and siren. Whitman stated that he last saw the gun right before the police officer pulled behind their car. Whitman testified, "And then after he was behind us for so long, [the

Defendant] attempted .... to pull over or confuse the police officer or lose him or whatever." The Defendant then turned onto a side street. Whitman stated that by the time the Defendant turned, "the policeman had shot at [them]. He let two rounds off at [them] ."

Whitman testified that at some point, the police car "rammed into the back of" their car, which "pushed [them] through the intersection." Whitman stated that their car "fishtailed" and was hit by another car. According to Whitman, the Defendant began climbing out of the driver's side door and ran around to the back of the vehicle, at which time the officer, who was also out of his car, "let off two more shots." The Defendant then laid down on the ground. Whitman testified that he remained in the car, and the police officer sprayed him in the face with "mace, pepper spray or whatever it was" so he "couldn't see anything." Officers pulled Whitman out of the car and he laid on the ground. Whitman recalled that his left knee was cut during the incident.

Whitman testified that the Defendant told him that he was going to Alcoa to buy cocaine. Whitman maintained that he did not want to be involved in a drug transaction, but that he just rode with the Defendant so he could see Garner. Whitman testified that he deliberately did not pay attention to the conversation in the club. Whitman testified that the Defendant owned a .45-caliber pistol with a "pointer" or laser sight on it. Whitman identified the gun recovered from the highway median as the Defendant's gun. Whitman testified that the Defendant always carried that gun, and Whitman just assumed that the Defendant had it with him when they went to Alcoa.

Charles "Chuck" Lassetter, an officer with the Knox County Sheriff's Department, testified that the police department towed the suspect vehicle to the City County Building, where it was turned over to detectives. According to Lassetter, the car was registered to Jamal Tory.

Brad Park, a crime scene technician with the Knox County Sheriff's Office, performed the final search of the suspect vehicle. Park testified that he also fingerprinted the vehicle and took photographs of the vehicle. Park testified that during his search, he found a bullet in the vehicle frame. Park also testified that he found a white plastic shopping bag "underneath the armrest between the insulation and the frame of the trunk." Park believed that someone would have to make an effort to put the bag where it was found. Inside the shopping bag, Park found four separate ziplock bags containing a white powdery substance. Park testified that no prints were found on the bags;

however, Brian Whitman's fingerprints found were [sic] on the rearview mirror.

Celeste White, a drug chemist with the Tennessee Bureau of Investigation (TBI), testified that she received four bags of white powder from the Knoxville Police Department. White understood that the bags had been recovered from the suspect's car. White analyzed the substance and determined that the substance weighed 475.6 grams and contained cocaine.

Carl Smith, a forensic scientist with the TBI, analyzed powder that was obtained from the crime scene. According to Smith, the sample contained 312.6 grams of cocaine hydrochloride, which is commonly referred to as cocaine, and 82.4 grams of cocaine base, which is commonly referred to as crack cocaine. Smith testified that some of the bags he received to test contained powdered sugar.

John Casale, a research chemist with the Drug Enforcement Agency (DEA), examined the cocaine taken from the suspect car and from the crime scene. Casale testified, "I reached the conclusion that all fourteen bags were from the same batch of cocaine." Casale stated that the cocaine came from Peru and was ninety-eight percent pure.

Deputy Sheriff Russell Hatcher of the Blount County Sheriff's Department participated in a law enforcement "sweep" of the median strip of Alcoa Highway on October 19, 1998. Hatcher testified that during the sweep, he found a black, semi-automatic handgun with a magazine in it. Hatcher believed that the gun was loaded, but he was not sure. Captain Lowell H. Ridings, Jr., testified that the gun later found in the median of Alcoa Highway had five rounds in the magazine.

Joseph Huckleby, an investigator in the Criminal Investigations Division of the Knoxville Police Department, testified that on September 9, 1998, approximately one month before the crimes in this case, he was working patrol when he recognized a man who had pending warrants against him. The man was in a vehicle with two other men. Huckleby approached the vehicle, arrested the suspect, and performed a "security pat-down" on the other occupants of the vehicle. The Defendant was one of the occupants. Huckleby found a .45 Glock magazine containing ten rounds in the Defendant's front pants pocket. The Knoxville Police Department confiscated the magazine.

Harvey McGill testified that on October 16, 1998, he was driving home from work around 5:40 p.m. McGill testified that the traffic was heavy and that he was in a turn lane when he spotted what he thought was a toy pistol laying on the ground. McGill testified that he opened his car door, reached down, and picked up the gun. McGill then realized that he had found a nine-millimeter pistol with a magazine. McGill testified that it looked as though the gun had been run over a couple of times. McGill took the magazine out of the gun and noticed that the gun was loaded and ready to fire. McGill wrapped the gun in a tee-shirt and left. When McGill read about the shooting on Aluminum Avenue in the paper, he contacted the District Attorney General, who notified the Alcoa Police Department. The police retrieved the gun shortly thereafter.

Oakley McKinney, a forensic scientist with the TBI, analyzed the two pistols found in connection with this case. McKinney testified that he found no latent prints on one of the guns and no identifiable latent prints on the other. McKinney stated that the nine-millimeter pistol had debris on it.

Tom Heflin, a forensic scientist with the TBI, testified that he specializes in firearms identification. Heflin examined the two guns associated with this case. Heflin also examined the Glock magazine that was confiscated from the Defendant a month prior to the crime. Heflin testified that the magazine that was submitted with the Glock pistol and the magazine confiscated from the Defendant were basically the same. Heflin acknowledged that there was no indication that the Defendant's magazine had been in that particular gun. However, Heflin determined that three of the cartridges in each magazine were "produced in the same lot of ammunition, which means that they could have very well possibly have been boxed in the same box of ammunition." Heflin also testified that two of the fired cartridge casings found at the scene and the six cartridges in the two magazines confiscated from the Defendant "had been produced by the same bunter tool." Heflin noted that usually when Glock pistols like the one in this case are sold to the public, they are sold with two magazines, each with a ten-round capacity. Both of the magazines that Heflin examined had a ten-round capacity.

Kathleen Lundy, an examiner in the Federal Bureau of Investigation laboratory, testified that she specializes in "elemental analysis and comparison of bullet and shot pellet lead specimens." Lundy testified that she performed a "comparative bullet lead analysis" in this case. Lundy explained that "when you analyze two bullets, if you find the same chemical composition, the conclusion is that they are from the same batch or pour or melt of lead." In this case, Lundy compared two bullets retrieved from Garner's body, one bullet

from the crime scene, a cartridge from the Glock pistol found in the median of the highway, four "test fires" from the Glock pistol, and the magazine that was confiscated from the Defendant. Lundy "found a total of three different compositions of lead represented by all the specimens analyzed." Lundy determined that the two bullets from Garner's body, the bullet from the crime scene, seven cartridges from the confiscated magazine, and five cartridges from the magazine in the Glock pistol had "analytically indistinguishable compositions."

Captain Daniel Neubert, Jr., of the Blount County Sheriff's Department testified that he is the Facility Administrator for the Corrections Division. According to Neubert, the Defendant had $38 and Whitman had no money when they were brought to the Blount County Jail on October 16, 1998.

Terrence Long testified that at the time of trial he was an inmate in the Blount County Jail, and had talked to the Defendant while the Defendant was incarcerated. Long recalled that someone asked the Defendant if he knew Sammy Garner. Long testified that the Defendant replied, "Oh, that punk-ass bitch." Regarding the last time the Defendant saw Garner, the Defendant stated, "Yeh, I remember that punk-ass bitch when I seen his brains splatter." Long testified that he and the Defendant were arguing when the Defendant made the statements about Garner. Long stated that he could not see the Defendant from his cell, but maintained that he knew that the Defendant made the statements because the person making the statements responded to the name "Asata." Long testified that he lived with Garner for ten years when his mother was married to Garner's father. Long stated that he had previously been to Stacey's Place and that he also knew Hill.

Dominic Rashad Kellogg testified that he was an inmate in the Blount County Jail at the time of the trial in this case. Kellogg testified that on October 16, 1998, he saw Garner at the home of a man named Jack. Kellogg stated that he noticed a gun in Garner's pocket and asked him what was going on. Garner said that he was going to sell a half of a kilogram of cocaine and left. Kellogg asked Garner to whom he planned to sell the cocaine, and Garner responded, "I don't know, I [have] never seen them before." Kellogg testified that Garner left Jack's house and walked toward a pavilion in the park.

Kellogg testified that he also knew the Defendant from the Blount County Jail. Kellogg recalled that he "cursed [the Defendant] almost everyday" regarding Hill and Garner. Kellogg testified that "[a]fter a couple of days, [the Defendant] finally said, 'I watched that bitch-ass nigger's brains splatter out of

his head.'" According to Kellogg, the Defendant also said, "If Charles Hill wouldn't have never been there, this wouldn't have never happened." Kellogg further testified that the Defendant stated that because the Defendant shot Hill in 1995, "[the Defendant] figured that they would get him before he got them." Kellogg testified that although he shared a cell with Terrence Long, the arguments between the Defendant and Long occurred before Kellogg became incarcerated or moved into the cell with Long. Kellogg testified that he also knew Hill.

Detective Dale Boring of the Alcoa Police Department testified that he was a witness for the State in an aggravated assault case in which the Defendant was accused of shooting Charles "Bill" Hill. According to Boring, Hill testified at the preliminary hearing, and the Defendant was present in the courtroom during Hill's testimony. The trial was subsequently set for November 10, 1998, but the case was dismissed when Hill was killed. Boring testified that $3.48 was recovered from Hill's clothing and that $71.00 was recovered from Hill's vehicle.

B.     Defense Proof

The Defendant testified that he graduated from high school and joined the Army, where he was a computer programmer from August 1992 until January 1995. At the time of the crime, the Defendant was attending Pellissippi State. The Defendant testified that he had known Whitman for about a year prior to the murders and that they saw each other once a week. The Defendant testified that he is five feet, five inches tall and that Whitman is approximately six feet, two inches tall. The Defendant stated that he introduced Whitman to Princeton Wells and that Whitman bought a .45 Glock pistol with a "laser beam" on it from Wells about five to eight months before the crime. The Defendant testified that Whitman carried the gun with him at all times.

The Defendant recalled that around noon on October 16, 1998, he was at Keathy Smith's house. The Defendant had gone to Smith's after leaving his girlfriend's house, which was located near Smith's house. The Defendant explained that his car had been impounded the previous night because the tags were expired. The Defendant testified that sometime between noon and one o'clock that afternoon, Whitman and Kenny Jamal Tory also arrived at Smith's house. The Defendant stated that Whitman drove Tory's car and took the Defendant to the impound lot to retrieve his car. After retrieving the car, both men returned to Smith's house. The Defendant testified, "When I first asked

[Whitman] to go take me to go get my car at the impound [lot], [Whitman] asked me would I take him to Alcoa to see Sammy Garner."

The Defendant testified that they returned to Smith's house from the impound lot at approximately 2:00 p.m., but they did not leave for Alcoa until after 4:00 p.m. because Whitman had been "trying to page ... Garner." Jamal Tory gave the Defendant and Whitman directions to get to Stacey's Place. According to the Defendant, Whitman asked to borrow Tory's 1998 four-door Oldsmobile because the motor in the Defendant's car began "ticking" on the way back from the impound lot. The Defendant testified that he drove because Whitman did not have a driver's license. The Defendant stated that Whitman told him that he was going "to talk about some musical equipment or to pick up some musical equipment or something like that."

The Defendant testified that on the way to Stacey's Place, he missed a turn and ended up at a Texaco gas station. The Defendant stated that he and Whitman attempted to call for directions, but the phone did not work so they drove down the street to a Food Lion grocery store to use the phone. The Defendant recalled that Whitman dialed Tory's number, but the Defendant talked to him. The Defendant testified that when they finally arrived at Stacey's Place, he pulled into the back part of the carport. Not finding anyone else there, the Defendant left the car engine running. The Defendant testified that Whitman got out of the car and told the Defendant, "I'll be right back." However, a few minutes later, the Defendant saw a "little red car" drive up to Stacey's Place. According to the Defendant, Hill was driving the car, and Garner was in the passenger's seat. Hill parked the car beside the car that the Defendant was driving. The Defendant testified that it did not bother him that Hill was there and that he had met Garner a couple of times previously through Tory. The Defendant testified that Whitman and Tory were best friends, and he recalled that Tory had previously indicated that Garner was Tory's cousin.

The Defendant testified that after Hill and Garner arrived at Stacey's Place, he still did not turn the car engine off. The Defendant stated that he stayed in the car while Whitman, Hill and Garner all went inside Stacey's Place. The Defendant recalled that everyone appeared to be friendly with one another.

The Defendant testified that after everyone went inside, his pager went off, so he went inside to use the telephone. According to the Defendant, Garner handed Whitman a phone from behind the counter, and Whitman handed the phone to the Defendant. The Defendant explained that he went outside to make

his phone call because he wanted some privacy. The Defendant stated that he planned to sit on the car to make the phone call, but he had to step out into the light to see the number on his pager. He stated, "[T]hat's when I heard the first two gunshots." The Defendant testified that the first two shots were more muffled than the following shots.

The Defendant recalled that he "immediately ran back towards the two parallel parked cars," but he "tripped and fell and the phone came out of [his] hand." The Defendant then noticed that the door to the club had been opened. The Defendant testified that he reached up to the car door and jumped into the back seat. According to the Defendant, he landed on a bullet-proof vest, put the vest on over his shirt, and "balled up" in the back seat of the car. The Defendant testified that Whitman jumped in the passenger seat of the car and asked the Defendant what he was doing. The Defendant stated that he asked Whitman what happened, and Whitman responded that "Dude shot him." The Defendant testified that Hill had braids in his hair and that Whitman told him that the man with braids shot Garner. The Defendant testified that Whitman, who had a gun when he got in the car, struck the Defendant in the head with the gun and said, "Nigger, you need to get me back to Knoxville...." The Defendant stated that he then got in the front seat and drove.

The Defendant testified that Whitman told him that Hill and Garner were arguing and then Hill "just pulled out the gun and shot [Garner] and ran out [of] the club." The Defendant drove past Shaggy's Place, but stated that he did not remember seeing anything unusual. The Defendant testified that he stopped at the stop sign at Aluminum Avenue and put his shirt on over the bullet-proof vest. The Defendant reported that he told Whitman that he wanted to go back to get Garner. According to the Defendant, Whitman asked him why and then said no. The Defendant stated that he then headed towards Alcoa Highway, but he "didn't have much to say to [Whitman]" because he was "way too upset." At this time, according to the Defendant, the gun was in Whitman's lap.

The Defendant testified, "[W]hen we passed by the police, [Whitman] took the gun and he put it ... in his waist and he grabbed a bag that was on the floor in front of him by his feet ... and jumped in the back seat with it." He stated, "I guess that had ... to be when he stuffed the drugs in the back seat." The Defendant stated that Whitman did not tell him what was in the bag and that Whitman did not have the bag when he went into Stacey's Place. The Defendant testified that Whitman told him, "If the police get[ ] behind us ... I'm going to shoot you if you pull over." The Defendant recalled that after a

minute or two, Whitman crawled onto the front seat. The Defendant testified that he did not see the gun when Whitman crawled onto the front seat, but stated that there was a "bulge" in Whitman's clothing where the gun could have been.

The Defendant testified that after the traffic thinned, he saw a police car behind them, but he did not notice the lights or siren. The Defendant stated that he wanted to find a way to stop without crashing or getting shot, so he turned right onto Woodson Drive. The Defendant maintained that he allowed the police to catch up to his vehicle because he "didn't want to lose them." The Defendant testified, "[The police officer] rammed us ... [a]nd then he shot at us and then he rammed us again right on through the stop sign. And then we crashed, we wrecked." When the car the Defendant was driving came to a stop, it had spun around and was facing the opposite direction.

The Defendant testified that the police car pulled up "door-to-door" with their vehicle, so the Defendant jumped over the back seat and climbed out of the passenger door. The Defendant observed the police officer slide across his seat and get out of his passenger side door. The Defendant testified that the officer "shot at [him]," so the Defendant "laid on the ground." The Defendant stated that the officer then "maced" him, slammed him into the back windshield, threw him on the ground, and handcuffed him. The police took the Defendant to the hospital and then to the Alcoa Police Department.

When asked if he knew about the cocaine, the Defendant replied, "No, not really. I knew [Whitman] put something ... I knew he was doing something with a bag in the back seat, but as to what, I really couldn't say then." The Defendant maintained that he would not have gone to Alcoa if he had known about the drug transaction. The Defendant testified, "I don't mess with [drugs] and I don't sell them." He also testified that his mother was addicted to drugs and died at an early age. Finally, the Defendant testified that while in jail he had arguments with Terrence Long and Dominic Rashad Kellogg and that they accused the Defendant of killing their friends.

Princeton Wells testified that he knew both the Defendant and Whitman. Wells stated that he sold a .45-caliber Glock pistol with two magazines to Whitman a couple of years before the trial. Wells testified that he had not met Whitman before he sold the gun to him and stated that the Defendant brought Whitman to Wells' house. Wells responded that he bought the gun, as well as a laser sight for the gun, at a gun show. Wells testified that he was a State's witness in a prior trial against the Defendant.

Scotty Anderson testified that he was an inmate in the Blount County Jail and recalled that he and the Defendant were housed in the same cell between March and June 1999. Anderson testified that he also knew Dominic Rashad Kellogg and Terrence Long. Anderson testified that he heard heated arguments between the Defendant, Kellogg, and Long. According to Anderson, Kellogg and Long were "talking crazy to [the Defendant]." Anderson testified that when Kellogg and Long accused the Defendant of killing Garner and Hill, the Defendant "just shook it off and said, you're crazy, you know, and just walked off." Anderson stated that he never heard the Defendant make any statements to Long or Kellogg indicating that he had any knowledge about the killings. Anderson admitted that he had a longstanding problem with drugs, alcohol, and sniffing paint.

Clinton Andrew Hacker testified that he was an inmate in the Blount County Jail, where he was housed in a cell with the Defendant for approximately one month. Hacker stated that he also knew Terrence Long and Dominic Rashad Kellogg. Hacker recalled that there was quite a bit of "bickering" between the Defendant and the other inmates. Hacker testified that they would "yell[ ] and scream[ ] at each other." Hacker testified that he never heard the Defendant talk about killing either of the victims.

Jason D. Love testified that he lives in Alcoa and was housed in the same jail cell with the Defendant during the summer of 1999. Love stated that he let the Defendant believe that he was from New York so that the Defendant would tell him about the incident. According to Love, the Defendant said that he went to Stacey's Place because "he was going to get something" from Garner, and then "he recognized somebody who he shot like a year or two ago." Love stated that the Defendant said he "knew something was funny because ... both of them walked into the kitchen." According to Love, the Defendant said that he thought Hill and Garner were going to get the drugs, but that while the Defendant was inside Stacey's Place, "he heard something cock." Love testified that the Defendant "said he figured the guy recognized him when he walked in, so he had to get them first. He said when he walked out, he had to do what he had to do." Love acknowledged that the Defendant never stated what he had to do. Love testified that the Defendant told him "not to say nothing."

Donnie Bridges testified that he was an inmate in the Blount County Jail with Love. He testified that he had an argument with Love because Bridges "associated with" the Defendant. According to Bridges, Love said that the Defendant had killed his friend.

*Id.*, 2002 WL 31051631 at **1-14.

Lowe next filed a petition for post-conviction relief, which was denied after an evidentiary hearing; the denial of post-conviction relief was affirmed on appeal. *Lowe v. State*, No. E2006-02028-CCA-MR3-PC, 2008 WL 631169 (Tenn. Crim. App. March 10, 2008), *perm. app. denied, id.* (Tenn. Aug. 25, 2008) [Addendum 33].

Lowe then filed the pending petition for habeas corpus relief. This court dismissed the majority of Lowe's allegations as frivolous but ordered the respondent to answer the following six claims: (1) the trial court failed to charge the jury on lesser included offenses [Habeas Petition, Doc. 3, pp. 7-8, ¶ 53.]; (2) Lowe's attorney rendered ineffective assistance of counsel by failing to obtain a copy of the 911 tape that would have attacked the credibility of Alcoa officer Ernest Kemper III [*id.* at 11, ¶ 55.D]; (3) Lowe's attorney rendered ineffective assistance of counsel by failing to obtain *Brady* material in the form of a statement by Jamal Tory [*id.* at 11-12, ¶ 55.E.]; (4) the State failed to turn over *Brady* material in the form of bloody shorts worn by the co-defendant Brian Whitman [*id.* at 13, ¶ 59]; (5) the State introduced testimony by FBI agent Kathleen Lundy regarding her ballistic analysis which has since been refuted by newly discovered evidence [*id.*, ¶ 61]; and (6) the State introduced into evidence proof of pending criminal charges against Lowe without proof of conviction [*id.*, ¶ 62]. The court also dismissed Lowe's claims for compensatory and punitive damages.

Pursuant to an amended complaint, Lowe was allowed to raise a new claim that the evidence was not sufficient to support the convictions, and the respondent was ordered to

answer that claim. [Amended Habeas Petition, Doc. 30-1, p. 10]. The respondent contends he is entitled to judgment as a matter of law based on procedural default with respect to many of Lowe's claims, and judgment as a matter of law based upon the findings of the Tennessee state courts as to the remaining claims.

III.     Procedural Default

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Lowe cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(c). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the

right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

This court has reviewed the entire record of this case. With that in mind, the court will consider whether certain of Lowe's claims are procedurally defaulted.

### A. *Failure to Charge on Lesser Included Offenses*

Lowe alleges that, with respect to the charge of first degree murder, the trial court should have charged the jury on the lesser included offenses of criminally negligent homicide, reckless homicide, and voluntary manslaughter; with respect to the especially aggravated robbery charge, he alleges the trial court should have charged the lesser included

offense of robbery. Although Lowe alleges that the court's failure to charge lesser included offenses violated his rights under the federal constitution as well as the Tennessee constitution, he does not cite to any federal law to support his claim. Lowe instead refers to *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001), for the proposition that a jury should be permitted to consider all offenses supported by the evidence. [Habeas Petition, Doc. 3, pp. 7-8, ¶ 53.]

In his brief on direct appeal, Lowe raised this issue solely as a matter of state law. [Addendum 12[2], Brief of Appellant, pp. 17-18]. The Tennessee Court of Criminal Appeals likewise considered the issue solely as a matter of state law. *Lowe v. State*, 2002 WL 31051631 at **14-17. Accordingly, by failing to raise this claim as a matter of federal constitutional law, Lowe has procedurally defaulted his claim that the trial court should have instructed the jury on lesser included offenses.

### B. Ineffective Assistance of Counsel / Failure to Obtain 911 Tape

Lowe alleges that his attorney rendered ineffective assistance of counsel by failing to obtain a copy of the 911 tape that would have attacked the credibility of Alcoa Officer Ernest Kemper III. [Habeas Petition, Doc. 3, p. 11, ¶ 55.D]. Although Lowe alleged numerous instances of ineffective assistance of counsel in post-conviction proceedings, he did not raise this particular claim in either his original *pro se* petition [Addendum 17, Technical Record

---

[2]Lowe's brief on direct appeal was incorrectly referred as Addendum 11 by respondent in the Notice of Manual Filing of Documents.

on Appeal from Denial of Post-Conviction Petition, pp. 2-12] or in the amended petition filed by appointed counsel [*id*. at 31-37]. Nor was the claim raised on appeal from the denial of post-conviction relief. [Addendum 31, Brief of Appellant, pp. 13-15]. Accordingly, Lowe has procedurally defaulted this claim of ineffective assistance of counsel.

### C. Ineffective Assistance of Counsel / Failure to Obtain Brady Material

Lowe alleges that his attorney rendered ineffective assistance of counsel by failing to obtain *Brady* material in the form of a statement by Jamal Tory. Specifically, Lowe claims as follows:

> Jamal Tory made a statement to unknown Knox County police or Knox County Sheriff's officers. In this statement Jamal Tory stated that the Plaintiff did not have the bulletproof vest on before Plaintiff left Knoxville. That he, Jamal Tory, left the vest in the back seat of the car and the vest belonged to him.

[Habeas Petition, Doc. 3, pp. 11-12, ¶ 55.E]. According to Lowe, this statement would have corroborated his testimony and impeached the testimony of State's witness Brian Whitman.

In his amended post-conviction petition, Lowe raised a claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and alleged that the State "was in possession of, yet failed to provide, exculpatory statements made by Jamal Kenny Toure [sic] concerning the location of a bullet-proof vest in the hours and minutes prior to the deaths in this case." [Addendum 17, Technical Record on Appeal from Denial of Post-Conviction Petition, p. 2-33]. Lowe also alleged that his attorney "failed to interview relevant witnesses concerning a bullet-proof vest." [*Id*. at 34]. Lowe did not, however, pursue those claims on appeal. [Addendum 31,

Brief of Appellant, pp. 9-15]. Accordingly, Lowe has procedurally defaulted this claim of ineffective assistance of counsel.

## D. Newly Discovered Evidence

Lowe alleges that his constitutional rights were violated when the State introduced testimony by FBI agent Kathleen Lundy regarding her ballistic analysis, which testimony has since been refuted by newly discovered evidence. [Habeas Petition, Doc. 3, p. 13, ¶ 61]. Lowe raised the issue in post-conviction proceedings, contending that he was entitled to a new trial based on newly discovered evidence. The Tennessee Court of Criminal Appeals noted as follows:

> This issue revolves around Lundy's testimony that the bullets discovered at the crime scene matched the bullets in the two clips-one found on the Petitioner's person four weeks before the shooting, the other found in the median of a highway down which the Petitioner attempted to flee from the police. At the time of trial, the FBI was in the process of concluding that Lundy's scientific analysis was faulty. Since the Petitioner's conviction, at least three cases have been reversed in sister jurisdictions where Lundy testified to this very issue.

*Lowe v. State*, 2008 WL 631169 at *20.

The appellate court then concluded that the question of whether Lowe was entitled to a new trial based upon newly discovered evidence should have brought under a writ of error *coram nobis* pursuant to Tenn. Code Ann. § 40-26-105. *Id*. at 21-22. The court further concluded that it could not treat Lowe's post-conviction petition as a petition for relief under the writ of error *coram nobis*. *Id*. at 23. Lowe having failed to comply with state procedural

rules for submission of this claim, he has procedurally defaulted his claim that his rights were violated by the testimony of Agent Lundy.

### E. Proof of Pending Criminal Charges

Lowe alleges that the State violated his constitutional rights by introducing into evidence proof of pending criminal charges. [Habeas Petition, Doc. 3, p. 13, ¶ 62]. He raised this issue on direct appeal as a matter of state law, the Tennessee Rules of Evidence, and the Tennessee Constitution, although he did make a passing reference, without caselaw citation, to the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. [Addendum 12, Brief of Appellant, pp. 21-22]. The appellate court considered the issue solely as a matter of state law. *Lowe v. State*, 2002 WL 31051631 at **19-21.

"General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

> A federal court will not address a habeas petitioner's federal constitutional claim unless the petitioner has first fairly presented the claim to the state courts. Fair presentation of a federal constitutional issue to a state court requires that the issue be raised by direct citation to federal cases employing constitutional analysis or to state cases relying on constitutional analysis in cases with similar fact patterns.

*Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) (citing *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995)). Accordingly, Lowe has procedurally defaulted his claim that his rights were violated by the introduction into evidence of pending criminal charges.

Lowe having defaulted the aforementioned claims, the court will consider on the merits only Lowe's claim that the State failed to turn over *Brady* material in the form of bloody shorts worn by the co-defendant, Brian Whitman, and his claim that the evidence was insufficient to support the convictions. With respect to those claims, the respondent contends he is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

IV.     State Court Findings

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Lowe may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. 28 U.S.C. § 2254(d). In addition, findings of fact by a state court are presumed correct and Lowe must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Lowe has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached

by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. In light of the foregoing, the court will consider Lowe's remaining claims for relief.

V.     Discussion of Claims on the Merits

A. *Failure to Disclose* Brady *Material / Bloody Shorts*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the Brady rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. at 682).

Lowe alleges the State failed to turn over *Brady* material in the form of bloody shorts worn by the co-defendant Brian Whitman. [Habeas Petition, Doc. 3, p. 13, ¶ 59]. He raised this claim in post-conviction proceedings:

> The Petitioner next argues that the State failed to secure and disclose a pair of bloody shorts that Whitman was wearing when he was pulled from the "getaway" car. The post-conviction court found Counsel was unaware of the existence of the shorts until Whitman testified to their existence, and it found the State failed to secure and disclose the evidence but that error was harmless. In our view, there are two critical "pieces" of evidence in issue: the tangible bloody shorts and the State's knowledge of the existence of the bloody shorts.

*Lowe v. State*, 2008 WL 631169 at *23.

In considering whether the State knew of the existence of the bloody shorts, the Tennessee Court of Criminal Appeals noted:

> The trial court specifically determined that the State knew of the existence of the shorts. Had the State shared this information with the Defendant prior to trial, the information that Whitman was wearing bloody shorts when he was pulled from the "getaway" car could have been used to cross-examine Whitman. Specifically, the information that Whitman's shorts were bloody may well have caused the jury to question Whitman's testimony that he did not shoot either victim. Whitman was the State's sole "eyewitness." The information that Whtiman's [sic] shorts were bloody, thus, might fall under *Brady*.

*Id.* at 25.

Nevertheless, the appellate court determined there was no *Brady* violation because there was no proof that evidence of the bloody shorts was material to the defense:

> We cannot conclude that the knowledge of the bloody shorts worn by Whitman when he was pulled from the getaway car is material because it is unclear whose blood was on the shorts. Post-conviction counsel failed to question Whitman as to this crucial fact, and we cannot make a materiality determination without this information. At trial, evidence was presented that

> broken glass, resulting from gunshots fired at and from the getaway car, was
> found at the scene of the apprehension of Whitman and [Lowe]. It is certainly
> plausible to think that Whitman, when confronted with the bloody shorts,
> would have simply stated that he was cut when exiting the getaway car, and
> he bled on his shorts. Assuming this was the response, this line of questioning
> would certainly not be material to [Lowe's] defense. Although we can also
> speculate to a response that would have been material, such as Whitman
> breaking down and confessing when confronted with knowledge of the bloody
> shorts, speculation is insufficient to grant post-conviction relief. Thus, in our
> view, no *Brady* violation occurred because the Petitioner has not proven that
> the knowledge of the shorts were material to his defense.

*Id*. at 26.

This court has reviewed the transcript of Lowe's post-conviction evidentiary hearing
[Addenda 18-19, vol. I-II, Transcript of Hearing, pp. 1-243] and finds that the conclusion of
the Tennessee Court of Criminal Appeals is supported in the record.  Trial counsel testified
at the evidentiary hearing that he did not file a motion to compel production of the bloody
shorts; instead he filed his usual discovery motion for exculpatory evidence and *Brady*
material and thought he "could make more hay out of the fact that the police didn't do
anything about it."  [Addendum18, vol. I, p. 112].

> The ol' O.J. Simpson type defense, you've lost the evidence, you didn't
> do anything about it.  And not only that, you know, I didn't know whether the
> evidence had been preserved, whether we had a chain of custody or anything
> of that nature.  So, I made more -- I tried to make a lot of light out of the fact
> that the police did nothing.

[*Id*. at 112-13].

Counsel acknowledged that he was not aware that the State had never seized the bloody shorts from Whitman: "My recollection was he said on the stand they're still at my house, during the trial." [*Id*. at 113]. Counsel further stated that he did not want to know the results of any testing of the bloody shorts because such tests could have shown that Lowe was guilty. [*Id*.]

> [T]he blood on that had to be either Mr. Whitman's or the victim, which was Hill, from the way the facts developed, and I didn't want to take a chance on it not being, you know, having no indication of that. I felt like the police had botched it up so bad that it would be better for him if I made it look like they weren't doing their job. They had rushed to judgment.

[*Id*. at 114].

Co-defendant Brian Whitman also testified at the post-conviction hearing. He admitted that, at the time of the incident, he was wearing shorts with blood on them. [*Id*. at 148]. He further testified that the shorts were never seized by the State, although Whitman offered them on several occasions to the State for testing. [*Id*.]. Whitman was not asked, however, whose blood was on the shorts.

Based upon the foregoing, there was no proof that evidence of the bloody shorts would have been material to the defense. Accordingly, the finding of the Tennessee Court of Appeals that there was no violation of *Brady v. Maryland* was neither contrary to, nor did it involve an unreasonable application of, controlling federal law. Lowe is not entitled to habeas relief on this claim.

## B. Sufficiency of the Evidence

Lowe alleges that the evidence was insufficient to support his convictions. In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the petitioner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, Lowe is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See Brofford v. Marshall*, 751 F.2d 845, 856 (6th Cir. 1985).

When reviewing a jury's verdict under a sufficiency of the evidence standard, a court must consider all the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Witness credibility is an issue to be left solely within the province of the jury, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992); *United States v. Schultz*, 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir. 1984). "[T]he federal court sitting in habeas should not attempt to substitute its own opinion for that of the jury which convicted the petitioner." *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988). A conviction should be affirmed if *any* rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir. 1986), *aff'd*, 483 U.S. 171 (1987).

The issue for this court, then, as framed by the AEDPA, is whether the state court reasonably applied *Jackson v. Virginia*. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). Deference is due at two levels: "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state appellate court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Id.* This is done "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. at 324 n.16.

The Tennessee Court of Criminal Appeals on direct appeal considered and rejected Lowe's claim of insufficient evidence. The appellate court first articulated the standard of review for the claim:

> When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

*State v. Lowe*, 2002 WL 31051631 at *26 (citing *Jackson v. Virginia*, 443 U.S. at 324) (other internal citations omitted). The court further observed:

> In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the

burden of showing that the evidence was legally insufficient to sustain a guilty verdict.

*Id.* (internal citations omitted).

The court next noted that the jury found Lowe guilty of the first degree premeditated murder and the felony murder of each victim on both counts and that "the trial court correctly accepted the verdicts, but merged them into a single conviction for first degree murder as to each victim. When a merger occurs, proof of either felony murder or premeditated murder is sufficient to sustain the conviction." *Id.* (internal citations omitted).

The appellate court then concluded that the evidence was sufficient to convict Lowe of first degree felony murder, which is defined under Tennessee law as "'[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." *Id.* at 27 (quoting Tenn. Code Ann. § 39-13-202(a)(2)).

In doing so, the court noted the testimony of Myron Lea Kellogg that Garner purchased a kilogram of cocaine two days prior to the offense and asked for a ride from Kellogg on the day of the offense because he had a drug deal to make, and the testimony of Senecal Toure Teeter that Garner left the park the day of the offense, stating that he was going to make a drug sale. *Id.* The appellate court also noted the testimony of Brian Whitman that Lowe went to Stacey's Place on the day of the offense to buy cocaine from Garner, and that Whitman saw Lowe run out of Stacey's Place with a bag of cocaine after hearing gunshots. *Id.*

Based on this testimony, the court concluded the evidence was sufficient for the jury to convict Lowe of especially aggravated robbery, which under Tennessee law is defined as "an intentional or knowing theft of property from the person of another by violence or by putting the person in fear, '[a]ccomplished with a deadly weapon,' and 'where the victim suffers serious bodily injury.'" *Id.* (quoting Tenn. Code Ann. §§ 39-13-403(a)(1) and 39-13-403(a)(2), respectively). The conviction of especially aggravated robbery thus supported the conviction of felony murder.

The Tennessee Court of Criminal Appeals also concluded that the evidence was sufficient to convict Lowe of first degree premeditated murder, which is defined under Tennessee law as "the premeditated and intentional killing of another person." *Id.* (citing Tenn. Code Ann. § 39-13-202(a)(1)).

> Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. Premeditation is defined as "an act done after the exercise of reflection and judgment."
>
> > "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> > Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct.

*Id.* at 27-28 (quoting Tenn. Code Ann. § 29-13-202(d)) (internal citations omitted).

The appellate court noted that "[t]he existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense." *Id*. at 28 (citation omitted). In addition, "the jury may infer premeditation from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing." *Id*. (citation omitted).

Based upon Brian Whitman's testimony that Lowe was wearing a bullet-proof vest when they left the park to go to Stacey's place, which Lowe was still wearing at the time of his arrest, and the bullet wounds to the victims, "[t]he jury could have reasonably inferred that [Lowe] procured and concealed the murder weapon prior to killing the victims." *Id*. Thus, "a jury could have reasonably found that [Lowe] killed the victims after the exercise of reflection and judgment." *Id*.

This court has reviewed the transcript of Lowe's trial [Addenda 2-7, vol. I-VI, Transcript of Evidence at Trial, pp. 1-891] and finds the conclusions of the Tennessee Court of Criminal Appeals are supported in the record.

Greg McCallie testified that Garner kept his cocaine in the kitchen of Stacey's Place. [Addendum 2, Transcript of Evidence, vol. I, pp. 81-82]. Myron Lea Kellogg testified that two days before the murders he went to Atlanta with Garner to buy a kilogram of cocaine. [*Id*. at 105]. Seneca Toure Teeter testified that on the day of his murder Garner left the park to make a drug sale. [*Id*. at 119-20].

At the time of his arrest, according to Alcoa police officer Ernest Kemper III, Lowe was wearing a bullet-proof vest. [Addendum 3, vol. II, pp. 201-02]. Brian Whitman testified

that he rode in the car with Lowe to see Garner [Addendum 4, vol. III, pp. 303-04], that

Lowe was wearing a bullet-proof vest [*id*. at 304-05], that Lowe was planning on buying

cocaine from Garner [*id*. at 314-16], and that Lowe had a pistol in his possession [*id*. at 318-

20]. Whitman also testified that, while he was in the parking lot using the telephone and

Lowe was in Stacey's place with Hill and Garner, Whitman heard shots and saw Lowe run

out of the building with a bag in his hand that was full of dope. [*Id*. at 324-29].

The findings of the Tennessee Court of Appeals that the evidence was sufficient to

support the convictions of especially aggravated robbery, first degree felony murder, and

premeditated first degree murder were neither contrary to, nor did they involve an

unreasonable application of, federal law as established in *Jackson v. Virginia*. Lowe is not

entitled to habeas relief on this claim.

## VI.   Conclusion

Lowe's motions for summary judgment will be **DENIED** and the respondent's motions

to dismiss will be **GRANTED**. The petition for habeas corpus relief will be **DENIED** and

this action will be **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The

United States District Courts. All other pending motions will be **DENIED** as **MOOT**. Lowe

having failed to make a substantial showing of the denial of a constitutional right, a

certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the

Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this

action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the

Federal Rules of Appellate Procedure.  The court will further **DENY** Lowe leave to proceed

*in forma pauperis* on appeal.

      **AN APPROPRIATE ORDER WILL ENTER.**


                    s/ Thomas A. Varlan
                    UNITED STATES DISTRICT JUDGE